```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
UNITED STATES OF AMERICA,                                   :
                                                            :    MEMORANDUM
                                                            :    DECISION AND ORDER
                                             Plaintiff,     :
                                                            :    19-cv-2912 (BMC)
                    - against -                             :
                                                            :
DANIEL BERNSTEIN and YANA                                   :
BERNSTEIN,                                                  :
                                                            :
                                             Defendants.    :
----------------------------------------------------------- X
```

**COGAN**, District Judge.

The Government brings this civil tax penalty collection action based on the taxpayers' failure to report their ownership of overseas bank accounts, as required by 31 U.S.C. § 5311, for the year 2010. The accounts were opened in Switzerland in 2002 and moved between Swiss banks. The case is a progeny of the Government's program in the first decade of this century to pressure the Swiss bank UBS into disclosing assets of Americans that it was holding secretly. That process ultimately resulted in a deferred prosecution agreement between the Government and UBS (the "UBS-DPA"), and because of UBS's assumed obligations under that agreement, the resulting increase in U.S. citizens participating in a partial amnesty program (referred to as a "voluntary disclosure program"). The taxpayers here, Daniel and Yana Bernstein, did not avail themselves of that program and hence we are here.

The parties have cross-moved for partial summary judgment on the issue of whether the failure to report the accounts was "willful" under the statute, because if it was, the civil penalty for the non-disclosure is exponentially enhanced. The Bernsteins have focused on their

completion of a Report of Foreign Bank and Financial Accounts ("FBAR") for the year 2010 in which they invoked their privilege against self-incrimination. They argue that they believed in good faith that their invocation of the privilege satisfied their obligation to file the FBAR, and that, in any event, their assertion of their privilege cannot be considered in determining whether they acted willfully in failing to report, as that would unduly burden their assertion of the privilege.

I see no need to reach the Bernsteins' preferred issue. Even without considering the invocation of the privilege in the FBAR, the other evidence of willfulness, particularly the history of these accounts leading up to their action in 2010, is so one-sided that no reasonable jury could find otherwise. The subject accounts were born of and raised on a deliberate desire to evade tax reporting. The Bernsteins' decision in 2010 to finally file an FBAR had the additional purpose of avoiding criminal prosecution, but that did not excise their continuing goal of avoiding their reporting obligation. I therefore grant the Government's motion for partial summary judgment and deny the Bernsteins' motion.

## BACKGROUND

The undisputed facts are taken from the parties' exchange of Local Rule 56.1 statements.

The Bernsteins are husband and wife. In 2002, the Swiss bank known as UBS opened an account in the name of an undisclosed company (the "640 account"), which the Bernsteins' attorney subsequently described as a "shell company." In any event, by the end of the year, if not earlier, the Bernsteins and their children beneficially owned the UBS 640 account. In 2004, the Bernsteins opened a second UBS account (the "4359 account") in which they also were the owners and the beneficiaries. The 640 account and the 4359 account together held about $1 million. The funds in the 650 account were transferred to the 4359 account in 2005.

The Bernsteins had a financial advisor, Yuri Nemirovski, who traveled with them to Switzerland to help them in opening the accounts. He and Daniel Bernstein advised the UBS banker that there must be no telephone or mail communications between them concerning the account, nor should any account statements be sent to them, and Daniel Bernstein signed account documents releasing UBS from any obligation to send account statements in exchange for a fee.

The required annual U.S. tax return forms include what is known as Schedule B. That form requires reporting of interest and dividends. It has a "Part III" entitled "Foreign Accounts and Trusts." One of the questions on the form, with little variation over the years, contains the following question and instruction:

| At any time during [the tax year], did you have a financial interest in or signature authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account? See instructions for exceptions and filing requirements for Form TDF 90-22.1. | Yes | No |
|---|---|---|
| If "Yes" enter the name of the foreign country > _____ | | |

In each tax year from 2002-2009, the Bernsteins checked the box "No." That was, of course, a false statement on a tax return. Although the Bernsteins had an accountant prepare their tax returns, including Schedule B, they deliberately did not tell the accountant about the UBS accounts (or their successor accounts at Bank Sal Oppenheim, described below). Daniel Bernstein testified that to tell the accountant "would defeat the purpose," because he "didn't want anyone to know about this account." Commenting on his 2009 return, Daniel Bernstein testified that he didn't tell the accountant "because it was a secret account."

By 2008, the Government, frustrated with Swiss and UBS's secrecy policies, ordered UBS to stop using some of its U.S.-based subsidiaries to provide private banking services to U.S. clients. In February 2009, the Government entered into the UPS-DPA. That agreement required

3

UBS, among other things, to provide the Government with the identities of, and account information for, certain U.S. customers.  The mechanism for the implementation of this UBS-DPA was an order of the Swiss Financial Market Supervisory Authority requiring UBS to make this disclosure.[1]

Two days after the public disclosure of the UBS-DPA, the Bernsteins, with Nemirovski's assistance, opened another Swiss account, this one at the private Swiss bank Bank Sal, and in June, they moved the funds in the 4359 account to Bank Sal.

Sometime shortly before September 2009, the Government submitted a request to the Swiss authorities for the Bernsteins' account information.  On or about September 25th of that year, UBS sent a letter to Daniel Bernstein (notwithstanding the Bernsteins having closed their UBS account), advising him that the Government was seeking this information.[2]  The UBS letter suggested several options on how to proceed, including consenting to the release of the requested information, or "[p]articipat[ing] in the IRS's voluntary disclosure program, which enables you to become compliant, avoid substantial civil penalties, and generally eliminates the risk of criminal prosecution."  The letter also stated that in the absence of any action by the Bernsteins, the information might be turned over to the Government, and if so, the Bernsteins would lose their opportunity to participate in the voluntary disclosure program.  The letter encouraged the Bernsteins to consult a U.S. tax advisor.

---

[1] Presumably, this mechanism gave UBS "cover" against customer claims under Swiss bank secrecy law.

[2] The letter from UBS was addressed to Daniel Bernstein.  Yana Bernstein recalls seeing a letter informing the Bernsteins that information was going to be turned over to the Internal Revenue Service, but could not recall whether the letter was from UBS or the IRS.  Nevertheless, the Bernsteins have submitted no evidence that the letter she recalls was anything other than the UBS letter to Daniel Bernstein.

4

Daniel Bernstein later consulted with a U.S. tax attorney, who told him that it was "nothing serious" because the account held "only a million dollars" and therefore the Government would not likely pursue it.  Furthermore, Nemirovski, who consulted with a Swiss attorney, conveyed to Mr. Bernstein that the attorney had assured him that their account information had not been turned over to the IRS.  Thus, the Bernsteins decided not to take any action in response to the letter and, specifically, not to participate in the Government's voluntary disclosure program.

In April 2011, the Government advised the Bernsteins that it was auditing their 2007 tax return.  By that time, the Bernsteins were aware of publicity about the Government's prosecution of UBS account holders.  They returned to the U.S. tax attorney who had told them not to worry two years earlier, but this time he told them, "I can't help you; you need a white-collar criminal attorney."  He referred them to Lawrence S. Feld, Esq., who is known for his white-collar practice with a specialty in tax prosecutions, and the Bernsteins retained him.

Attorney Feld effectively disagreed with the prior decision not to participate in the voluntary disclosure program.  He found the facts as presented to him "deeply disturbing" and believed that there was a "substantial risk" of criminal prosecution.  He advised the Bernsteins to file an FBAR for the 2010 tax year in which they would invoke their privilege against self-incrimination under the Fifth Amendment of the U.S. Constitution.  He prepared an addendum to the FBAR describing the basis for the privilege in which the Bernsteins offered to make more detailed disclosures if they received use immunity from criminal prosecution.  In addition, the Bernstein's 2010 tax return and Schedule B invoked the Fifth Amendment with regard to any questions about foreign accounts.

Attorney Feld believed that this would protect the Bernsteins from criminal prosecution, although they still might be required "to pay [a] fine." The Bernsteins followed his advice and filed an FBAR for the year 2010 in which they did not provide information about the accounts, instead, in the spaces calling for account information, inserting "Fifth Amendment" in answer to each question. At their depositions, the Bernsteins testified as to their belief, based on the advice from Attorney Feld, that by submitting the FBAR in this manner, they had complied with the disclosure requirements for 2010.

The advice given by Attorney Feld appears to have been sound as there is no suggestion in the record that the Bernsteins are subjects or targets of a criminal investigation. However, in May 2017, the IRS assessed a penalty in the amount of $262,288.50 each for the 2010 tax year. The Bernsteins have disputed the penalty, and the Government has brought this action to recover it.

## DISCUSSION

### I.

"[S]ummary judgment may be granted only if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Marvel Characters, Inc. v. Kirby, 726 F.3d 119, 135 (2d Cir. 2013) (internal quotation marks omitted). "In determining whether there is a genuine dispute as to a material fact, [the court] must resolve all ambiguities and draw all inferences against the moving party." Id. In ruling on a motion for summary judgment, a district court "may rely on any material that would be admissible at a trial." Lyons v. Lancer Ins. Co., 681 F.3d 50, 57 (2d Cir. 2012) (internal quotation marks omitted); see also Call Ctr. Techs., Inc. v. Grand Adventures Tour & Travel Pub. Corp., 635 F.3d 48, 52 (2d Cir. 2011) ("[T]he nonmoving party must come forward with admissible evidence sufficient to raise a

genuine issue of fact for trial in order to avoid summary judgment.") (internal quotation marks omitted). A dispute is not "genuine" if no reasonable jury "could return a verdict for the nonmoving party." Nabisco, Inc. v. Warner–Lambert Co., 220 F.3d 43, 45 (2d Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

**II.**

Section 5314 of the Tax Code, part of the Bank Secrecy Act of 1970, provides that:

> [T]he Secretary of the Treasury shall require a resident or citizen of the United States or a person in, and doing business in, the United States, to keep records, file reports, or keep records and file reports, when the resident, citizen, or person makes a transaction or maintains a relation for any person with a foreign financial agency.

31 U.S.C. § 5314(a). Subsection (a) of that statute lists the type of information that must be provided with the form to be determined by the Secretary of the Treasury. Id. at § 5314(a)(1-4). A "financial agency" is defined to include a "commercial bank or trust company" or a "private banker." Id. at § 5312(a)(1) and (a)(2)(B) and (C). The purpose of the provision is to

> require certain reports or records where they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism.

Id. at § 5311.

Pursuant to these provisions of the Bank Secrecy Act, the Secretary of the Treasury has adopted regulations to ensure compliance. Under 31 C.F.R. § 1010.350(a), "[e]ach United States person having a financial interest in, or signature or other authority over, a bank … or other financial account in a foreign country shall report such relationship to the Commissioner of Internal Revenue for each year in which such relationship exists[.]" That section also specifies that the form required to report is the FBAR, Form No. TD-F 90-22.1. Under 31 C.F.R. §

7

1010.306(c), as in effect for 2010, "covered persons," including all U.S. citizens, must file the form by June 30 each year for foreign accounts exceeding $10,000 in the prior calendar year.

If a U.S. citizen fails to comply with the statute and its regulations, the Secretary may impose a civil monetary penalty of up to $10,000 for a non-willful violation, unless the taxpayer shows reasonable cause for the non-compliance. 31 U.S.C. § 5321(a)(5)(B)(i) and (ii). However, if a U.S. citizen "willfully violat[es]" or "willfully caus[es] a violation," the penalty increases to either $100,000 or 50% of the amount in the assets in the unreported account, whichever is higher. Id. at § 5321(a)(5)(C) and (D). In addition, § 5322 provides for criminal prosecution of willful violators, with penalties of up to 5-10 years in prison and $250,000-$500,000 in fines, depending on whether the violation is in conjunction with the violation of any other federal law or part of a pattern of illegal activity. Id. at § 5322(a) and (b).

### III.

Neither the statute nor the regulations define the term "willful", and the parties have offered different definitions. The Bernsteins rely on Cheek v. United States, 498 U.S. 192 (1991). That was a criminal prosecution for attempting to evade taxes by not filing tax returns. The Supreme Court held that the test was subjective, requiring the Government to prove beyond a reasonable doubt that the defendant knew of the duty imposed by law and voluntarily and intentionally violated it. The focus of the Court's opinion was that this test allows for subjective ignorance or good-faith misunderstanding of the law, because if those states of mind are present, then it cannot be said that the defendant knew of the duty imposed by law.

The Supreme Court reversed the defendant's conviction based on the district court's having mis-instructed the jury that the test for willfulness was objective, even though the defendant's testimony – that he had been indoctrinated by an anti-tax group, and having studied

8

case law, had come to believe that the tax law did not require the reporting of wage income – seems fairly absurd. Nevertheless, the Supreme Court held that the sincerity of the defendant's professed belief is for a jury to determine – if a jury finds that the defendant genuinely had such a lack of sagacity or other impediments to understanding, then he has not acted willfully, even if a reasonable person would not share his belief. "[I]f Cheek asserted that he truly believed that the Internal Revenue Code did not purport to treat wages as income, and the jury believed him, the Government would not have carried its burden to prove willfulness, however unreasonable a court might deem such a belief." Id. at 202.

The Bernsteins' argument thus seeks to equate Cheek's tax-protest indoctrination and tax law research with Attorney Feld's advice. If Cheek could be found not guilty based on his subjective belief from the external information he received that he was not willfully violating the tax law, then, they argue, Attorney Feld's advice could be the basis for them to subjectively believe that they were complying with the Bank Secrecy Act in 2010 when they filed their FBAR with a Fifth Amendment reservation.[3]

The Government rejects the Bernsteins' reliance on Cheek, principally because it arose in the criminal rather than civil context. It instead relies on Bedrosian v. United States, 912 F.3d 144 (3d Cir. 2018), which has a lot of similarities to the instant case. There, the taxpayer had maintained but failed to report a UBS account since 1973. He first told his accountant about it in the 1990s, and the accountant advised him to continue to not report it because if the Government found a problem, any liability would likely be assessed against his estate after his death. The taxpayer then opened a second, much smaller account at UBS in 2005.

---

[3] In addition, the Bernsteins argue, unlike Cheek, their understanding of the filing requirement was correct, that is, as Attorney Feld told them, filing an FBAR with a Fifth Amendment reservation constitutes full compliance with the filing requirement. I will address this point in the next section.

9

In 2007, the taxpayer hired a new accountant, who prepared an FBAR for 2007. It reported the second account but not the far larger, first account. Thereafter, the taxpayer realized the seriousness of his misconduct (likely because it arose in the context of the UBS-DPA) and began correcting his earlier filings, but the IRS assessed the 50% deficiency on the larger account for 2007. The taxpayer asserted that he had given his new accountant the same papers he had given his old accountant. He further asserted that although he had not read his 2007 return before signing it, he had relied in good faith on the new accountant to prepare the appropriate FBAR and Schedule B disclosure.

The Third Circuit held that as to civil consequences, unlike in the criminal context, the determination of "willfulness" in filing an incomplete FBAR is objective, not subjective:

> Though "willfulness" may have many meanings, the general consensus among courts is that, in the civil context, the term often denotes that which is intentional, or knowing, or voluntary, as distinguished from accidental, and that it is employed to characterize conduct marked by careless disregard whether or not one has the right so to act. …
>
> That is, a person commits a reckless violation of the FBAR statute by engaging in conduct that violates an objective standard: action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known.

Id. at 152-53 (quotations and citations omitted).

Although Bedrosian did not reference Cheek, I find it persuasive as to the definition of willfulness under the civil penalty provision of the FBAR statute. Cheek recognized that "[t]he general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system." 498 U.S. at 199. Nevertheless, the Supreme Court carved out a special exception for criminal tax prosecutions because of the complexity of the tax laws:

> Congress did not intend that a person, by reason of a bona fide misunderstanding as to his liability for the tax, as to his duty to make a return, or as to the adequacy of the records he maintained, should become a criminal by his mere failure to measure up to the prescribed standard of conduct.

Id. at 200 (quoting United States v. Murdock, 290 U.S. 389, 396 (1933)).

The Second Circuit also addressed this distinction in Lefcourt v. United States, 125 F.3d 79 (2d Cir. 1997). That was a civil suit by Gerald Lefcourt's law firm to recover a penalty that the IRS had assessed against the firm for failing to file a currency transaction report ("CTR") when it received more than $10,000 in cash from a client. See 26 U.S.C. § 6050I. Instead, the firm filed a CTR that invoked various privileges, and, in an accompanying affidavit, asserted that to disclose the name of the client would violate those privileges. The Second Circuit held that, even assuming that the CTR was filed in good faith belief that the privilege was validly invoked, the civil standard of a willful violation applied. This meant that since the law firm had knowingly failed to disclose the client's identity as the form required, it was liable for the penalty, notwithstanding a subjective belief that its invocation of privilege was proper:

> Cheek was a criminal case, and we are persuaded that its rationale does not apply in the context of the civil tax penalties at issue here. … The concern that an individual taxpayer unfamiliar with the nuances of the tax code might confront a felony conviction upon a nonpayment of taxes is not present in this context, where the filer faces only a civil penalty. …
>
> Cases construing analogous civil penalty provisions in the tax code and, in particular, provisions requiring a showing of willfulness also persuade us that no heightened *mens rea* is required in this context. Courts considering such provisions define willfulness in terms of "voluntary, conscious, and intentional" conduct. …
>
> As it is uncontested that Lefcourt was aware that [the CTR] asked for its client's identity and nonetheless chose to refuse to provide the name, there is no dispute that Lefcourt acted voluntarily. We thus agree with the district court that, as a matter of law, Lefcourt's failure to disclose the client-identifying information was willful and in "intentional disregard" of the law firm's obligation.

Lefcourt, 125 F.3d at 83 (citations and quotations omitted).

Although not expressly mentioned by the Second Circuit, Cheek's rationale has less application in cases like Lefcourt, and even less in the instant case, for another, related reason. The Supreme Court in Cheek was focused on the ordinary taxpayer who prepares his own returns – what may be called the "least sophisticated taxpayer" – and was concerned about whether this taxpayer "should become a criminal," 498 U.S. at 200, merely because of a good faith belief that he was complying with the tax law's complexities despite that belief being objectively unreasonable. In contrast, the Lefcourt firm was receiving over $10,000 in cash. It was obviously aware of the CTR requirement. The criminalization of an unsophisticated, misguided taxpayer was not an issue.

Taking it a step even further, we are confronting in the Bernsteins' case the use of off-shore bank accounts in tax havens – not exactly something undertaken by the unsophisticated taxpayer. Taxpayers like the Bernsteins have access to, and in this case they actually used, professional investment and tax advisers to tell them not only the requirements of the law but to help them make decisions on how to comply (or not) with it. Unlike most taxpayers, the Bernsteins were not seeking tax advice for the sole purpose of complying with their annual tax obligations. Rather, their situation was driven by their long history of deception that exposed them to serious criminal liability. There was no "right answer" any tax lawyer could have provided them – at least for tax reporting purposes – absent making a full disclosure.

The Bernsteins' attempts to distinguish Bedrosian and Lefcourt are unpersuasive. As to the former, they emphasize the Third Circuit's focus on recklessness – the taxpayer's failure to review his own tax return, which would have disclosed the non-reporting of his large foreign account – as the equivalent of willfulness. Here, the Bernsteins contend, there was nothing

reckless about their reporting in 2010 – they retained a pre-eminent tax attorney and followed his instructions on the best way to proceed to a T.

The Bernsteins' attempt to distinguish Bedrosian makes it worse for them. It is true that the Third Circuit focused on recklessness, but recklessness is a subset of, or an alternative to, willfulness. See Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 57 (2007) ("where willfulness is a statutory condition of civil liability, we have generally taken it to cover not only knowing violations of a standard, but reckless ones as well."). The civil law uses it for the same purpose that the criminal law sometimes uses "willful blindness," that is, to prevent an actor from denying the patently obvious. See Viacom Int'l, Inc. v. YouTube, Inc., 676 F.3d 19, 35 (2d Cir. 2012). This means that while a finding of recklessness will usually equate with a finding of willfulness, the converse is not always true. Here, the Bernsteins' very deliberate decision not to disclose the account in 2010 despite having full information and advice of the potential criminal and civil consequences of disclosure versus non-disclosure was not in the least bit reckless. But it was the epitome of willfulness.

As to Lefcourt, the Bernsteins argue that the case involved attorney-client privilege rather the privilege against self-incrimination, and that the former has much more weight in this context. It suffices to note that the Lefcourt firm invoked both their client's Fifth and Sixth Amendment privileges, the attorney-client privilege, and even the ethical rules applicable to attorneys, i.e., the firm took the position that its principal's law license could be at stake. Although the Second Circuit did not expressly rule on any distinction between the attorney-client privilege and these other privileges, it affirmed the grant of summary judgment in favor of the IRS over their assertion.

13

Once it is determined that the definition of willfulness to be applied in a civil tax penalty case is that described in Bedrosian and Lefcourt, its application here is self-evident. The Bernsteins had a clear choice: disclose the required information and risk a criminal prosecution for earlier years, or abstain from disclosing with a good-faith assertion of their privilege and hope that would eliminate criminal liability and hopefully, perhaps as a matter of negotiation, limit civil liability. They made a good choice; they appear to have avoided criminal liability despite what is almost certainly criminal conduct in prior years. But it was most definitely a voluntary, deliberate, and willful choice.

Moreover, the willfulness inquiry is not limited to their conduct with regard to the 2010 tax year, even though the liability may be. The Bernsteins do not and cannot contend that the historical evidence of their dealings with these accounts is irrelevant or immaterial to the determination of willfulness in 2010 (indeed, the history is in their own Local Rule 56.1 statement). The undisputed facts show deliberate decisions over the course of nearly a decade to park funds overseas at UBS to avoid disclosing them; not telling their accountant about these bank accounts to avoid having to disclose them; falsely answering the question every year for seven years in Schedule B of whether they had off-shore accounts; moving their accounts to a private bank days two days after learning of the UBS-DPA; choosing not to participate in the voluntary disclosure program but instead taking their chances of civil and criminal liability; and then, finally, in 2010, making a limited disclosure that still did not satisfy the requirements of the Bank Secrecy Act but hopefully minimized the impact of their nine year plan of concealment.

That last act in 2010 does not erase the willfulness of their conduct. They didn't have to make an incomplete disclosure. They could have made a full disclosure and still have the ability to negotiate civilly and, if necessary, criminally. But they didn't want to enter those discussions

14

burdened by an express admission of their prior wrongdoing.  That was their choice, and no reasonable jury could conclude that it was anything other than willful.

### IV.

Although acknowledging that the invocation of the Fifth Amendment privilege can have adverse consequences for the declarant in civil litigation (such as by the drawing of an adverse inference, see United States v. 4003-4005 5th Ave., 55 F.3d 78, 82-83 (2d Cir. 1995)), the Bernsteins' primary argument is that it would unduly burden the privilege to consider the privilege references in their 2010 FBAR in determining whether they acted willfully.  They rely on two types of cases: (1) criminal tax cases where the invocation of privilege on a tax return or tax form cannot form the basis for the prosecution, see, e.g., Garner v. United States, 424 U.S. 648, 652 (1976); United States v. Josephberg, 562 F.3d 478, 492 (2d Cir. 2009); United States v. Barnes, 604 F.2d 121, 148 (2d Cir. 1979); and (2) some civil or at least quasi-criminal contexts where courts have excluded the invocation of the Fifth Amendment from consideration because of the calamitous consequences that the declarant might experience (e.g., the loss of employment or a professional license).  See, e.g., Uniformed Sanitation Men Ass'n v. Comm'r of Sanitation of City of New York, 392 U.S. 280, 284-85 (1968); Spevack v. Klein, 385 U.S. 511, 515-19 (1967).

If this case had to go to a jury, I might well find it appropriate to instruct the jury that it could draw an adverse influence by reason of the invocation of the privilege.  This is not the kind of quasi-criminal case cited by the Bernsteins where their entire future is at stake.  See Spevack, 385 U.S. at 515-19.  This is a case where a family of millionaires by off-shore accounts alone stands to lose half of those accounts (and only those accounts, and only half of them) by reason of a decade long scheme to avoid disclosing them.

15

But I see no reason to have to determine whether or what kind of consequences should flow from the particular statements in the Bernsteins' 2010 FBAR.  As the preceding discussion shows, in concluding that no reasonable jury could find anything other than that the Bernsteins' willfully failed to comply with the statute, I did not draw an adverse inference against them or indeed rely on their assertion of privilege in any way.  The statute and regulations say that the Bernsteins must provide certain information to the Government every year.  They chose not to provide it and now must face the music from their non-compliant filing.[4]  The reason they chose not to provide it is immaterial to the analysis.  See Lefcourt, 125 F.3d at 83.

It is often useful on summary judgment motions to envision what would happen if the motion was denied and the case went to trial.  Here, the jury would receive evidence of all of the Bernsteins' dubious conduct between 2002 and 2009 described above.  See Fed. R. Evid. 401, 404(b).  It would then be apprised of their 2010 FBAR and the invocation of their privilege.  If I went the Bernsteins' preferred direction (instead of instructing the jury that it could draw an adverse inference against the Bernsteins by reason of their invocation of the privilege, which I might or might not do), I would then instruct the jury, in substance, that "you may not consider the Bernsteins' invocation of their Fifth Amendment privilege in determining whether they acted willfully.  That is not a bad act. They had a right to assert their privilege.  You must only

---

[4] "A party who asserts the privilege against self-incrimination must bear the consequences of lack of evidence and the claim of privilege will not prevent an adverse finding or even summary judgment if the litigant does not present sufficient evidence to satisfy the usual evidentiary burdens in the litigation." 4003-4005 5th Ave., 55 F.3d at 83 (internal quotation marks and citation omitted).  In our case, the only reason the Bernsteins could not fully comply with their disclosure requirements was because they did not want to reveal prior unlawful activity.  This does not excuse their non-disclosure.  See United States v. Stirling, 571 F.2d 708, 728 (2d Cir. 1978) ("Appellants chose to engage in lawful activity in an unlawful manner.  That unlawfulness cannot now be used to excuse them from regulatory disclosure requirements, even though such disclosures could lead to criminal prosecution under other statutory schemes.").

16

determine whether they willfully failed to disclose information that is required by law." Based on the definition of "willfulness" set forth above, I only see one answer to that question.

This is not semantics. It is the difference between using the privilege as a shield against criminal liability as opposed to a sword to cut off civil liability, in effect, a tax-planning device. It would be all too easy for tax cheats, once caught or on the verge of getting caught, to invoke their Fifth Amendment and avoid civil tax penalties. That result would be unacceptable and there is no precedent for it.

The privilege against self-incrimination is important, but it is not impenetrable. It admits to waiver and exceptions even in the criminal context, just like common law privileges. When moved into the civil context, its importance often diminishes, and as shown above, there is no blanket prohibition against giving it adverse effects. But one thing it is not in the civil context is the equivalent of an outright acknowledgement of the facts. It is also not a substitute for compliance with law.

## CONCLUSION

The Government's motion for partial summary judgment [17] is granted, and defendants' motion for summary judgment [18] is denied.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
September 13, 2020

17